The first case on today's docket is the case of Cindy A. Ahrens v. Timothy A. Ahrens, and we have Mr. Robert Sprague here for the appellant, and Mr. Jim Wilson for the attorney. Cindy, I know you're prepared to do so. Thank you for your support. My name is Robert Sprague. I represent the appellant, Timothy Ahrens. This is a divorce case that was tried in St. Clair County, and we raised some issues when we sealed the trial for the court of error. The first issue is we sealed the trial for the court of error in that finding that the property located at 4116 West Branch Road would be non-marital property. The court in its plea to the client that the PA contracting was a non-marital property. The PA contracting was a company operated by my client actually prior to the marriage. The evidence shows that my client was paid a salary. The defendants were paid a salary of $7,000 to $8,000 per year from the PA contracting. Courts have held that in determining whether the marital estate is entitled to reimbursement for non-marital business for contributions and personal efforts, the court may inquire as to whether the spouse is reasonably compensated for its business affairs. If the spouse has been reasonably compensated, there shall be no reimbursement. It's our position that the PA contracting is a non-marital company. The defendants were paid a salary, and therefore, the personal efforts should not be reimbursed. And the law is the property that's acquired in exchange for non-marital property is non-marital property. The bus pass to property in question was deeded to Timothy Aarons only on June 15, 1994. The marriage was February 14, 1994. In evidence is plaintiff's Exhibit No. 8, which was a copy of the PA contracting's bank statement dated June 30, 1994. It showed check No. 126 dated June 10, 1994 was issued for $30,000, and check No. 127 June 13, 1994 was issued for $282,000. The purchase price of the bus pass property was $311,000. There was testimony that the parties never put any money into PA contracting, and that PA contracting had $150,000 in the bank at the time of the marriage and $600,000 in accounts receivable. We believe that the evidence is clear that the transfer of the $311,000 from PA contracting, a non-marital company, or the purchase price of the bus pass property made the bus pass property non-marital property. As it was issued, as I stated earlier, it was deeded only to Timothy Aarons. If the court doesn't buy that argument, then we believe that we're entitled to reimbursement of $311,000 in the marital estate. If the court decides that the trial court property found bus pass property to be marital property, we believe that the non-marital estate is entitled to be reimbursed the $311,000. The next issue raised is the court found that property located at Top Road, otherwise known as Dougherty Farm property, was marital property. In evidence, Claims Exhibit No. 4 showed that the property was acquired on September 28, 1999, and it was deeded to Tim Aarons, Cindy Aarons, Tim Aarons Jr., and Anthony Aarons. Tim, Tina, and Anthony Aarons are Tim Aarons' children. They're not the children of Cindy Aarons. It also shows that Exhibit No. 3 is a check. Exhibit No. 111 was issued for $341,695.29, which is the purchase price of the Dougherty Farm property. So Anthony would argue that this property was purchased with non-marital money. The court found that this property was marital in order to reimburse Cindy Aarons one-half of the property. First of all, it's our position that the only part of this marital property is marital. It's 40%. It was deeded to five people. Three of them are children, and two of them were the parties to this lawsuit, so they own 40% of this property. It's our position that by putting the children's name on the property, it was a gift. Donative intent is presumed with respect to gifts for the purpose of marriage dissolution proceeding, the transfer from parent to child, and that donative intent may be overcome by clear and convincing evidence. To the contrary, there's no evidence that there was no donative intent to give 60% of this property to three children of Timothy Aarons. So therefore, it's our position that the court erred in finding that property to be marital in order, in my opinion, to reimburse Mrs. Aarons for one-half of it. The next issue we raise is that the trial court erred in finding property known as the Old Highway 141 Fenton property. In paragraph 11 of the judgment, the court finds the parties agreed that real estate located at Old Highway 141 Fenton, Missouri, was owned by a respondent, petitioner, and respondent's three children and was valued at $96,000. The parties agreed that all owners contributed an equal share to the purchase of the property. That's the trial court's finding, and then the trial court finds that to be marital property and orders my client to pay Cindy Aarons half of the marital property. It's our position, again, that at best 40% of this is marital property because it was acquired during the marriage by the respondent, the petitioner, and the respondent's three children, and the court found that everybody paid their equal share. So the three children owned 60% of the property. So it's our position the court erred there. The last issue raised by us is the court found that the plaintiff awarded Plaintiff Cindy Aarons $100,000 from the bank court stop. Plaintiff's exhibit number nine is the statement from the bank court. It clearly shows that the bank court was owned by TA Contracting. The plaintiff even testified that TA Contracting acquired bank court, and that the plaintiff also testified that the parties never put any money into TA Contracting. So we would adopt our earlier argument that the bank court is non-marital property because it was acquired by TA Contracting, which is a non-marital corporation, which paid the parties a salary and therefore were not entitled to be reimbursed for personal work for the corporation. The court in its order talks about the Hempke case. The Hempke case is different in this case in that Hempke was a farmer, and they put all their money into one account, and they spent money, and they paid expenses out of that account. There was no evidence in the Hempke case that he was ever paid a salary like in this case. In this case, it's true they did pay some personal bills out of TA Contracting, but that's my position. That's just to give that the salary paid to them was reasonable, and therefore the marital estate is not entitled to reimbursement. The last issue I raise is that the court ordered my client to pay $9,000 of plaintiff's attorney's fees. The law is clear in Illinois. Parties seeking an award of attorney fees must first show financial inability to pay the fees and the financial ability of the spouse to spay. Under the judgment the way it's written, of course I'm asking that a lot of it be reversed, but under the judgment the way it's written, the plaintiff was awarded $1,075,000, and certainly the plaintiff could afford to pay their $9,000 of attorney fees. So the appellant would ask the court to reverse the findings on the various property, ask the marital property, and ask the bank for it, and to reverse the findings. That's the court's order, ordering my client to pay attorney fees. Thank you. Thank you, Mr. Craig. We'll have the opportunity for a follow-up. Ms. Wilson? May it please the court, my name is Susan Wilson. I'm the attorney for the appellee in this matter, Mr. Craig. It is our position in this case that the Hinckley case is relevant, not that it's the only relevant case in this matter, but in the Hinckley case we had a 16-year marriage, which is identical to what we had here. We have a non-marital corporation slash farm slash business owned by a Hinckley family prior to the marriage of the Hinckleys, and after the marriage, basically all of the income that was earned was put into this checking account. In the Hinckley case they call it the checking account, and basically all the bills were paid out of that, both personal and business. In the case before the court, we have the Ahrens who got married. There was a TA contracting corporation. There was also an HIA corporation. There was multiple corporations, but the facts in this case are that all of the income that Mr. Ahrens earned was put into this TA contracting account, or the majority of it. The problem in this case is Mr. Ahrens, despite repeated requests for discovery, what was in TA contracting at the time of the marriage, what was in TA contracting throughout the marriage, what was in TA contracting at the end of the marriage, what was in your personal bank account if you had one, and what was in any other account, he didn't produce those documents. And then at the trial, he comes to the court, and when he's asked to prove that his non-marital money, that he alleged was non-marital, prove it to the court, the court said, what evidence do you have? He said, well, I have over here in my briefcase, I have some checking accounts, some bank accounts. And the court asked if they had been produced to me, and they had not. And so the court kept those from being entered. But despite that, Mr. Ahrens or his attorney made no offer of proof to say, okay, here's a bank statement or here's some proof, here's a scintilla of proof of any of this is my non-marital property. In the Ahrens case, he refused to give us any financial information throughout the pendency of this case. And then tried to come to trial and say, well, I have a lot of proof. Yes, I haven't produced it, but I've got it in that briefcase. The other thing you'll notice in this case is throughout his testimony at the trial, and in fact, one of the continuances we had at the trial was because he said his daughter, who was now his bookkeeper and had been Mrs. Ahrens prior to that, she was going to testify and she was going to bring to light all of this proof about the bank accounts and about the income and about these various things. She, her name was Tina, I believe. Tina will tell you, I don't have this information, but Tina has all this information. We got a continuance of the trial because Tina wasn't available. So when we finally came to trial, Tina is outside the trial the whole time. He refers to Tina throughout the trial. Tina will come and testify. They close their proof. Tina doesn't testify. So we make the point in our brief, if somebody doesn't supposedly have all the information and the person is there to testify and Mr. Ahrens or his attorney do not bring that person on to testify, you can make some presumptions with regard to what she would say or what she wouldn't say. What's also very relevant in this case is Mr. Ahrens relies on the one thing he says that he can show is that at the time of the marriage there was allegedly $150,000 in the TA contracting account and there was allegedly $600,000 of accounts receivable. However, never did he bring any proof of that. He had a prenuptial agreement that they brought before the court, and it says, and if you look in our brief, we actually, and in the record you show the, it was, the prenuptial agreement was typed out. It's very short, but the part about the property of the marriage, of the premarital property of the parties, it's handwritten. It's basically scribbled on there. The court, in reviewing that document, we brought before the court a request to void that document because we felt it wasn't, it didn't comply with Missouri law, which is where it was enacted. The court voided that prenuptial agreement. And in so voiding it, the order is very clear that the property was not named like it was supposed to be named in Missouri law. It was not complete like it was supposed to be complete in Missouri law. And basically the date on the, on the prenuptial agreement, you have one date on the front and a different date on the back. You have the years left off in the prenuptial agreement. You have a notary that's not notarized. And when it's asked who prepared this prenuptial agreement, it was an attorney, allegedly, whose name he couldn't remember, but Mr. Ahrens testified that when they actually signed it, it was on the day or the day before they got married. And his accountant printed it off of some computer and said, hurry up, sign this. My client testified she wasn't allowed to read it because they were in a hurry to get to the marriage. So bottom line is the only scintilla of proof that Mr. Ahrens had anything in the account prior to the marriage was his prenuptial agreement, which was voided summarily by the court. He then could have brought in the court, the records, the bank records. He could have brought in any number of other things. He could have brought his daughter to testify. He did none of that. And when confronted by the court and by counsel, why didn't you bring information about TA contracting to prove that anything was non-marital? He says, oh, I didn't know that that request produced included TA contracting. If you look in the brief, it explains. It says proof of any kind from any source as to whether something is non-marital property. When confronted about that, Mr. Ahrens said, well, I don't know why my attorney didn't bring it. That's your problem. So he summarily dismissed us and said, you know what, it's not my problem that I didn't produce it. It's your problem. I contend it is his problem. If he wants to allege something is or prove something is non-marital property, he has to bring some proof. He brought none here. He has one or two checks six months after they got married from an account, a TA contracting account, but he brings nothing the five months before. He brings nothing for any of the months afterwards to show what was there, what was earned during the marriage, and what may have been earned prior to the marriage. So it was our position that he did not prove to any degree what was his non-marital property. But even more importantly, in this particular case, the TA contracting paid everything, personal and business, out of their account, or almost everything. The washer and dryer at the home bought out a TA contracting. He said they did that because when they wore their clothes home, which was not a uniform, to their home that night, they washed those clothes in the washer and dryer, therefore it should be bought out of TA contracting. They bought tractors and cars out of that account, which were personal tractors and cars, never reimbursed. So throughout this matter, they had no symmetry. Everything was basically the income went in there, and they purchased things out of there. Yes, there was a salary, but they never proved anything was ever bought with that salary. In fact, we don't know what happened with that salary. We were never given the information about that salary. In this particular case, with regard to the account, my client worked at the business for almost 16 years, I believe. She was able to sign the checks, and she was told what to do and what not to do. He said he was bringing, and his physician said that he was bringing some kind of a dissipation argument against her, but again, when the time came, he found no proof and submitted no proof she dissipated anything. So it's our belief that the income earned during the marriage, and the cases are cited in our brief, that is marital income. And the property bought during the marriage is marital property. Now, Mr. Sprague indicated that she got one-half of the property, the real estate, even though she wasn't necessarily on the deed as one-half of the owner of all of it. However, that's not exactly correct. She got less than half of the marital land. If you add up the real estate and all of the marital real estate, first of all, you've got to take into account that there was over half a million dollars in property that the court found to be non-neural real estate. They found the TA contracting to be a non-neural corporation, which obviously was able to produce millions of dollars throughout the years. They also found the HIA corporation was non-neural. So we have unknown amounts. There was never any kind of even an allegation of what TA contracting was worth, but we know we have at least half a million dollars in real estate that's not marital property, and then these two large corporations. As far as the property that the court found to be marital property, they ordered Mr. Ahrens to pay a little less than half of the value of the land to Mrs. Ahrens. They ordered him to pay one-fifth of the stock that they found to be marital property. And with regard to some vehicles and some farm equipment, they ordered him to pay $25,000. So if you look at the overall picture, she got a lot less than half of what the court found to be marital property. And in addition to getting more than half the marital property, Mr. Ahrens got at least half a million in non-neural land and then these two large corporations. So if you look at the equitable distribution, it may be one item may have been a little higher, the other may have been a little low. But if you look at the overall picture, my client got a lot less than half of the marital property and obviously none of the non-neural property. She had no non-neural property of her own other than some jewelry, which she testified that she had to sell throughout the pendency of this case because she was unable to pay her bills on her own. So I believe that the distribution, first of all, was an accurate distribution. It was an accurate labeling of marital and non-neural property. With regard to the attorney fee issue, yes, it's true that if my client received and when she receives her part of the property that she's entitled to and her part of the money, at that point she would be able to pay her attorney's fees. But I think the court in awarding attorney's fees in here was looking at a couple other issues. One was her ability to pay throughout the pendency of this, and she clearly had no ability to pay at all. She got a little bit of maintenance but was not even enough to pay her regular bills, prompting her to have to sell her jewelry. But more importantly, I think the attorney fees that were awarded here had to do with Mr. Aaron's failure to apply with discovery, Mr. Aaron's contempt on a couple of matters, Mr. Aaron's cavalier attitude toward the court and toward the rules of procedure and feeling that they didn't apply to him. So I think the court recognized, and by the way, 9,000 is just a small amount of the fees that were incurred in this case. The court recognized that there were certain fees that were necessarily awarded to her because of partly the misconduct of Mr. Aaron's and also the great, huge difference in their distribution of marital and non-marital property. Do we know the amount of fees that were requested to be paid by Mr. Aaron's? I know that they were in excess of 20,000, but I don't know. There is an affidavit in the file of the request. We had a couple of different requests throughout, and I know we were awarded some interim fees at one point and then some additional fees, and each time it was a great deal less than the whole amount, maybe half or less. I don't want to quote the number, but it is in the record. But it's substantially more than 9,000. I have nothing further. Are there any questions of the court? Thank you. I didn't try this case. I wasn't involved in all the discovery dispute. I got hired to do the appeal, and when I got hired to do the appeal, all I could do was review the record, review the transcript, review the exhibits, and write a brief. All the things I point out in my brief are in the record. I think they support what I argued earlier. This is an appeal about distribution of assets, whether she didn't get enough of the marital assets or not. They didn't raise that on appeal. This appeal is about whether some of these properties should be non-marital, as opposed to marital. The court finding is that the court found in one instance that the property was needed, the five people, they all paid their equal share, and then the court found it to be marital property. This is about distribution. As I said earlier, the Hinckley case did not apply. In the Hinckley case, they took all the farm income and put it in one account, and they just used that account in this case. It's true that they bought personal items out of TA, but I would say that's a gift to the marital estate, that they got salaries out of TA. That's in the record. Therefore, my previous argument as to what property should be non-maritalized, I would say it should be non-marital. The marital estate's non-title would be reimbursed because the salary was paid. Thank you. Thank you, Mr. Sprague. Ms. Wilson will take that on your advice as to whether you're willing to reimburse.